NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0360n.06

No. 25-2092

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CORNELIUS PHELPS, | ) | |
| Plaintiff-Appellee, | ) | **FILED** |
| | ) | Aug 13, 2026 |
| v. | ) | KELLY L. STEPHENS, Clerk |
| | ) | |
| CITY OF SAGINAW, MICHIGAN, a municipal corporation; FRATERNAL ORDER OF POLICE ASSOCIATES, RAY JANNI LODGE, INC.; VINCENT JACKSON; DESIRAE KZINOWEK; OSCAR LOPEZ; FRATERNAL ORDER OF POLICE OF SAGINAW, INC., | ) ) ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| Defendants, | ) | |
| | ) | OPINION |
| TERRANCE MOORE, in his individual and official capacities, | ) ) | |
| Defendant-Appellant. | ) ) | |
| | ) | |

Before: BATCHELDER, MOORE, and THAPAR, Circuit Judges.

MOORE, J., delivered the opinion of the court in which BATCHELDER, J., concurred. THAPAR, J. (pp. 24–31), delivered a separate dissenting opinion.

**KAREN NELSON MOORE, Circuit Judge.** In July 2020, Cornelius Phelps and other community members set up a table outside the Saginaw Fraternal Order of Police lodge. As they had done before, they sought to engage police officers in discussion about the issue of police brutality, which had recently gripped the nation. Not ten minutes later, officers had taken Phelps down to the ground, kneed him, tased him four times, handcuffed him, and arrested him on several charges (of which he was later acquitted or which were dismissed). In Phelps's subsequent civil-

rights suit, the district court concluded in relevant part that Officer Terrance Moore violated Phelps's clearly established constitutional right to be free from excessive force by tasing Phelps and, thus, denied Moore's motion for summary judgment on qualified-immunity grounds. Mindful that we ourselves are not finders of fact, we agree that a reasonable jury could reach that conclusion. We hold that Phelps has adduced evidence from which a reasonable jury could find that Phelps was not actively resisting arrest when Moore repeatedly tased him and that Moore's force was therefore excessive in violation of Phelps's Fourth Amendment rights. We further hold that the right of an individual not to be tased when they are not actively resisting arrest was clearly established by July 2020. Accordingly, we **AFFIRM** the decision of the district court and **REMAND** for further proceedings.

## I. BACKGROUND

### A. Factual Background

In the wake of the murder of George Floyd by Minneapolis police officers in the summer of 2020, Cornelius Phelps joined with a coalition of activists to form the Ghost of George Floyd (GOGF). R. 59 (D. Ct. Op. at 1) (Page ID #1482). GOGF held several events at which members, including Phelps, set up a table and invited law enforcement to join the group in conversation. *Id.* at 2 (Page ID #1483). Some of these events took place at Jeffer's Park, adjacent to the Saginaw Police Department; at one, group members spoke with Saginaw's Chief of Police. *Id.*

Around the same time, concerns about the Saginaw Police Department's use of force prompted the Department to amend its force policy. *See* R. 53-5 (News Article at 1–2) (Page ID #832–33). Several weeks later, a Saginaw Police Department officer was terminated pursuant to the new policy for punching a woman while she was handcuffed and in custody. R. 59 (D. Ct. Op.

at 2) (Page ID #1483).  Other officers then allegedly "engaged in a 'blue flu' protest, calling in sick for three days."  *Id.*  Believing the blue flu protest to be "unconscionable" and evidence of a cultural issue among the officers, Phelps organized a demonstration in front of the Fraternal Order of Police of Saginaw lodge located at 1120 S. Niagara St. [hereinafter FOP Lodge].  *Id.*; R. 53-26 (Phelps Dep. at 33, 42) (Page ID #937, 946).  Prior to the demonstration, Phelps reviewed GIS records and identified a particular parcel of land adjacent to the FOP Lodge that appeared to be public property.  R. 59 (D. Ct. Op. at 2) (Page ID #1483).  The land was a grassy area between the FOP Lodge parking lot and a set of railroad tracks.  *See* R. 53-12 (Land Survey) (Page ID #856).  On July 26, 2020, Phelps and other GOGF members set up a table at that location.  R. 59 (D. Ct. Op. at 3) (Page ID #1484).

Officer Vincent Jackson was patrolling his assigned area when he observed GOGF setting up their table and "congregating by the edge of the FOP [Lodge] parking lot."  *Id.*  At the time, he happened to be on the phone with Sergeant Oscar Lopez, then the President of the Fraternal Order of Police of Saginaw.  *Id.*  Jackson told Lopez about the group's whereabouts, and Lopez responded that the FOP Lodge was private property and that he would like the group to be removed.  *Id.*  The ensuing events were captured on the body-worn cameras of Jackson, Officer Desirae Kzinowek, and Officer Terrance Moore as well as the dash camera in Jackson's squad car.  Another GOGF member who was a bystander to the events also captured much of what occurred on their phone camera.

Jackson, Kzinowek, and Moore exited their vehicles and approached the GOGF group.  Jackson greeted the group, and Phelps, who was standing nearest to the parking lot and the officers, told him, "we're here to set up a table for you."  Jackson Bodycam at 1:24–25.  Jackson said that

he had been "asked by the President of [the FOP] to ask you all to leave." *Id.* at 1:26–31. Phelps responded that they were "actually not on their property," and that the area was a "right of way." *Id.* at 1:31–33. Phelps asked if Jackson wanted the group to back up a little bit, to which Jackson replied that the group could not be on railroad property, either. *Id.* at 1:34–40. Phelps and Jackson went back and forth a bit about the group's being asked to leave. *Id.* at 1:41–2:22.

Phelps remarked, "okay, let's figure this out," and Jackson responded, "there's nothing to figure out, but to leave." *Id.* at 2:22–24. Jackson continued to tell Phelps that the group was trespassing and needed to leave. *Id.* at 2:25–38. Phelps appeared to look around for a possible other location, while Jackson explained that trespassing "is a misdemeanor in the state of Michigan" and Phelps "could go to jail for that." *Id.* at 2:40–55. Phelps responded that he understood what Jackson was saying. Phelps then turned around to address the rest of the group and announced "they're really testing this right-of-way situation. I'd be interested in seeing the lines—As far as I know, the right-of-way stops where the sign stops." *Id.* at 2:56–3:17. He turned back to the officers and said, "they don't own this," gesturing to the strip of grass where the group was congregated, "and we're not on their property." *Id.* at 3:17–23. Jackson reiterated that they were being asked to leave, and Phelps again denied that the group was on FOP Lodge property. Phelps asked other members of the group to move back some items that were closest to the edge of the parking lot. *Id.* at 3:24–33.

Jackson then asked who the leader of the group was. Phelps and several others raised their hands. *Id.* at 3:33–43. Jackson asked Phelps if he "had ID on him," and Phelps replied, "I don't actually." *Id.* at 3:43–46. Jackson approached Phelps and said, "well turn around and put your hands behind your back for me." *Id.* at 3:46–48. Jackson grabbed Phelps's left wrist while

4

repeating his request for Phelps to put his arms behind his back. *Id.* at 3:48–55. Phelps said, "whoa, can you slow down?" and remained with his arms out in front of him, hands open and spread. *Id.* at 3:55–4:00; Kzinowek Bodycam at 3:11–14. As Jackson continued telling Phelps to put his arms behind his back, Phelps remarked that he was afraid and had been assaulted by police before. Jackson Bodycam at 4:00–10; Kzinowek Bodycam at 3:26–33. Kzinowek approached Phelps and took hold of his right wrist while Jackson placed a handcuff on Phelps's left wrist. Phelps's arms were still in front of him. Jackson Bodycam at 4:07–11. The two officers attempted to move Phelps's arms behind his back, and Phelps exclaimed, "somebody help me" and "I committed no crime." *Id.* at 4:12–21. He said, "sir, you're hurting me." *Id.* at 4:22–26.

Jackson and Kzinowek forced Phelps down to the ground. Kzinowek Bodycam at 3:45–48; Jackson Dashcam at 4:27–31. Phelps managed to get up on his knees and prop himself up with his arms, still facing the ground. Kzinowek Bodycam at 3:50–52. He pleaded for someone to help him. *Id.* Jackson kneed Phelps four times on his left side, Jackson Dashcam at 4:36–41, and Moore unholstered his taser, *id*. at 4:35–37. While Jackson pushed his hands down on Phelps's upper and lower back, Moore pressed his taser against Phelps's upper back. Kzinowek Bodycam at 4:03–05; Jackson Bodycam at 4:35–42. Jackson repeatedly yelled at Phelps to put his hands behind his back. Jackson Bodycam at 4:35–42. Kzinowek attempted to grab Phelps's right arm, but Phelps apparently pulled it away. *See* Jackson Dashcam at 4:33–55. Jackson several times announced, "you will be tased." Jackson Bodycam at 4:50–5:12. Phelps repeated that he was "in the right-of-way" and told the officers, "you don't have to do this" and "please don't." *Id.* at 5:10–24.

Jackson said to Moore, "tase him." *Id.* at 5:24–25. At this moment, Phelps was able to turn around so he was seated on the ground, leaning back, facing the officers with his hands held up and open in front of him. *Id.* 5:25–27; Jackson Dashcam at 5:30–34. He continued to say "please don't." Jackson Bodycam at 5:27–33. Phelps said, "sir, this has happened to me before. Please, I'm begging you." *Id.* at 5:33–34. Jackson then released Phelps and stepped back several steps. *Id.* at 5:34–36; Jackson Dashcam at 5:36–37. Moore stood several feet in front of Phelps with his right arm extended pointing his taser at Phelps. Jackson Bodycam at 5:35; Moore Bodycam at 0:18–25. Phelps remained seated on the ground, facing the officers, leaning back, and holding his open hands up in front of him. Jackson Bodycam at 5:35; Moore Bodycam at 0:18–25; Jackson Dashcam at 5:36–50. Phelps repeated his pleas. Jackson Bodycam at 5:35–48. No officer was touching Phelps at this time. *Id.* Jackson continued to order Phelps to put his arms behind his back. *Id.* Phelps said, "Officer Moore, you don't have to do this." *Id.* at 5:49–52.

Jackson then announced, for the first time, that Phelps was "under arrest." *Id.* at 5:56–57; Moore Bodycam at 0:37–40. He repeatedly told Phelps to put his arms behind his back. *Id.* at 5:50–6:03. Phelps said, "can we all stop yelling?" Jackson Bodycam at 6:02–04. Jackson and Moore continued to order Phelps to put his arms behind his back, *id.* at 6:05–47, while Phelps advocated his innocence and asserted that he "committed no crime," Moore Bodycam at 0:47–57. Phelps said, "sir, you have me down on the ground." Jackson Bodycam at 6:24–46. Jackson again said to Moore, "tase him." *Id.* at 6:45–46. Moore announced "taser" three times. *Id.* at 6:49–53. As Moore continued to tell Phelps to put his hands behind his back, Phelps twice asked, "are you afraid of me?" *Id.* at 6:53–58. All the while Phelps remained sitting on the ground, leaning back in a defensive posture, facing the officers with his hands up, and Moore pointed his taser at Phelps.

6

*See* Jackson Dashcam at 5:50–7:06. No officer was touching Phelps, and Phelp was not physically resisting. *Id.*

Moore deployed his taser and the prongs struck Phelps in his left arm. Jackson Bodycam at 7:04. Phelps exclaimed in pain and began to flail on the ground. *Id.*; Jackson Dashcam at 7:07–09. The prongs were apparently dislodged while Phelps was rolling on the ground, *see* Bystander Video at 4:33–36, and Moore tased him a second time three seconds after the first. Jackson Bodycam at 7:07. The prongs struck Phelps on his back. Moore Bodycam at 1:50–52; *see also id.* at 2:03. Phelps continued to roll and flail on the ground while Jackson again ordered him to put his arms behind his back. Jackson Bodycam at 7:07–16. Officer Jackson attempted to pull Phelps's right arm, while Phelps lay on the ground on his stomach asking for help. *Id.* at 7:15–16. Jackson twice stated, "he's still resisting." *Id.* at 7:18–19; Moore Bodycam at 2:02–04. At this point Phelps had been tased twice within fifteen seconds and was unmoving.

Moore pressed Phelps's back down on the ground with his left hand and used his right hand to deploy his taser a third time. Jackson Bodycam at 7:19–24; Moore Bodycam at 2:03–09.[1] Phelps curled in a defensive position. Jackson Bodycam at 7:27–31. Jackson continued to tell him to put his hands behind his back, to which Phelps replied, "I can't move." *Id.*; Moore Bodycam at 2:09–12. Kzinowek attempted to pull Phelps's left arm. Jackson Bodycam at 7:34–36. Moore tased Phelps a fourth time. *Id.* at 7:38–42; Moore Bodycam at 2:20–26. The officers then pulled Phelps's arms behind his back and handcuffed his wrists. Jackson Bodycam at 7:44–8:00. Phelps

---

[1]Although it is not entirely clear from the video, Moore appears to have re-activated his taser to deliver another round of electrical current to the already-deployed probes in Phelps's back, as opposed to using his taser in drive-stun mode.

continued to state that he could not move. *Id.* at 7:44–8:03. A bloody wound is visible on his left arm where the taser prongs first struck him. *See* Moore Bodycam at 2:57. The officers pulled Phelps up to his feet and walked him to one of the squad cars. Jackson Dashcam at 8:39–9:05. At some point, Phelps soiled himself. R. 59 (D. Ct. Op. at 6) (Page ID #1487). He later urinated blood. *Id.*

Phelps was later charged with trespassing, resisting arrest, and obstruction. *Id.* at 7 (Page ID #1488). He was acquitted of trespassing, and the other charges were dismissed. *Id.*[2]

## B. Procedural Background

In May 2023, Phelps sued the City of Saginaw, the Fraternal Order of Police Associates Ray Janni Lodge,[3] Jackson, Moore, Kzinowek, and Lopez under 42 U.S.C. § 1983 alleging various violations of his constitutional rights and under Michigan law for assault, battery, and malicious prosecution. R. 1 (Compl. at 19–30) (Page ID #19–30). The Fraternal Order of Police and Lopez were dismissed from the case (on their motion) in January 2024. R. 35 (Order at 2) (Page ID #486). The remaining defendants subsequently moved for summary judgment. R. 47 (Mot. for Summ. J.) (Page ID #521). While the motion was pending, the Parties stipulated to Kzinowek's dismissal. R. 56 (Stipulated Order at 2) (Page ID #1478). In November 2025, the district court granted the defendants' summary-judgment motion except as to Phelps's excessive-force claims against Moore. R. 59 (D. Ct. Op. at 49) (Page ID #1530). The court concluded that Phelps had

---

[2]The dissent offers a very different view of events. Perhaps in the end the jury will agree with that narrative. But at this stage, it suffices that the videos taken in the light most favorable to Phelps would certainly permit a reasonable jury to see things as we have recounted them.

[3]He later amended his complaint to name the Fraternal Order of Police of Saginaw, instead. R. 20 (Am. Compl. at 1) (Page ID #180).

presented sufficient evidence that Moore used excessive force in tasing Phelps in violation of his Fourth Amendment rights and that Moore was not entitled to qualified immunity on that claim because the right not to be tased when one is not actively resisting was clearly established on July 26, 2020. *Id.* at 30–35 (Page ID #1511–16). Moore timely appealed.[4] R. 62 (Notice of Appeal at 1–2) (Page ID #1543–44).

## II. JURISDICTION

We have jurisdiction to review a district court's denial of qualified immunity on summary judgment under the collateral-order doctrine. *Mitchell v. Forsyth*, 472 U.S. 511, 526–28 (1985). Our "jurisdiction regarding [such] orders . . . , however, is narrow." *Harrison v. Ash*, 539 F.3d 510, 517 (6th Cir. 2008). We may review "only purely legal questions." *McGrew v. Duncan*, 937 F.3d 664, 669 (6th Cir. 2019). That is, a defendant "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995). Where factual disputes persist, a defendant may nonetheless "invoke our jurisdiction by conceding the plaintiff's version of the facts." *Anderson-Santos v. Kent County*, 94 F.4th 550, 554 (6th Cir. 2024). If the defendant fails to do so, we generally are deprived of our jurisdiction. *Gillispie v. Miami Township*, 18 F.4th 909, 916–17 (6th Cir. 2021). But if the still-disputed facts are not "crucial," *id.* at 917, meaning that they are "immaterial to the legal issues raised by the appeal," we will

---

[4]Moore purports to appeal the district court's denial of summary judgment on Phelps's excessive-force claim and Phelps's state-law assault and battery claim. R. 62 (Notice of Appeal at 1) (Page ID #1543). Moore fails, however, to present any argument on appeal as to the state-law claim. He has therefore forfeited the issue.

separate out those unreviewable factual determinations and retain jurisdiction over the appeal, *id.* (quoting *Adams v. Blount County*, 946 F.3d 940, 951 (6th Cir. 2020)).

Here, Moore sufficiently concedes the facts so as to invoke our jurisdiction. Phelps urges the opposite conclusion. He argues that the appeal should be dismissed for lack of jurisdiction because Moore insists that Phelps was actively resisting arrest at the time of the tasing, contrary to the district court's determination that a reasonable jury could find Phelps was not actively resisting. D. 19 (Appellee Br. at 18–23). True enough—Moore repeatedly describes Phelps as actively resisting. *See, e.g.*, D. 12 (Appellant Br. at 5, 11, 14, 15, 17, 21); D. 21 (Reply Br. at 5). For the most part, however, Moore does not dispute the facts that underlie his assertions of "active resistance"—the conflict is in the characterization. We therefore focus on the actual, undisputed facts to guide our consideration of the legal issues in this appeal.

### III. ANALYSIS

#### A. Legal Framework

We review de novo a district court's denial of summary judgment based on qualified immunity. *Clark v. Abdallah*, 131 F.4th 432, 444 (6th Cir. 2025). An officer "is entitled to qualified immunity at summary judgment when, viewing the facts in the light most favorable to the plaintiff, the challenged conduct did not violate 'clearly established . . . constitutional rights of which a reasonable person would have known.'" *Heeter v. Bowers*, 99 F.4th 900, 908 (6th Cir. 2024) (alteration in original) (quoting *Jackson v. City of Cleveland*, 64 F.4th 736, 745 (6th Cir. 2023)). Conversely, "if the facts alleged and evidence produced, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that the officer violated a clearly established constitutional right, dismissal by summary judgment is inappropriate." *Barton v. Martin*, 949 F.3d

938, 947 (6th Cir. 2020). We use a "two-part test . . . to determine whether a law enforcement official is entitled to qualified immunity." *Shumate v. City of Adrian*, 44 F.4th 427, 439 (6th Cir. 2022). First, we "decide whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Second, we "must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* We elect, here, to take the steps in that order.

## B. Violation of Constitutional Rights

Our first task is to "decide whether the facts . . . adequately established a violation of [Phelps]'s constitutional right[] to be free from excessive force . . . under the Fourth Amendment." *Vanderhoef v. Dixon*, 938 F.3d 271, 276 (6th Cir. 2019). "The 'touchstone of the Fourth Amendment is "reasonableness,"' as measured in objective terms." *Barnes v. Felix*, 605 U.S. 73, 79 (2025) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Thus, "the question in a case like this one . . . is whether the force deployed was justified from 'the perspective of a reasonable officer on the scene,' taking due account of both the individual interests and the governmental interests at stake." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Answering that question "requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. Three relevant, though non-exhaustive, considerations are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* A reasonable jury could find that all three factors weigh in Phelps's favor in this case.

11

### 1. Severity of the Crime

Phelps's suspected offense was minor. When the officers first arrived on the scene, the only crime of which Phelps was, and reasonably could have been, suspected was trespassing—a misdemeanor punishable by thirty days' imprisonment and/or a $250 fine under Michigan law. Mich. Comp. Laws § 750.552. We have previously held that trespassing is a "minor offense," *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 174 (6th Cir. 2004), and we reaffirm that conclusion here. The severity factor still weighs against the use of force in this case, moreover, even if we also consider the charges of obstruction and resisting arrest. *Jackson-Gibson v. Beasley*, 118 F.4th 848, 854–55 (6th Cir. 2024) (describing nonviolent resisting or obstructing an officer as not severe); *Reed v. Campbell County*, 80 F.4th 734, 748 (6th Cir. 2023) (describing obstructing a public official as of "minimal" severity). "Conduct that is not a violent or serious crime does not permit an officer to use increased force absent other factors." *King v. City of Rockford*, 97 F.4th 379, 394 (6th Cir. 2024) (quoting *Vanderhoef*, 938 F.3d at 277). "Although tensions escalated" over the course of Phelps's encounter with police, "there was minimal (if any) connotation of violence" in Phelps's behavior. *Id.* (citation modified); *see also Barton*, 949 F.3d at 953 (concluding that the crime-severity factor weighed in the plaintiff's favor where there was "no threat to human safety"). Furthermore, Jackson came upon the GOGF protest in the course of his regular patrol; the officers were not responding to an emergency call or report. *See Shumate*, 44 F.4th at 441–42. Thus, the minor nature of Phelps's suspected offense(s) weighs strongly in his favor here.

## 2. Threat to Officers

A reasonable jury could conclude that Phelps did not pose a threat to the safety of the officers or any other person. Phelps remained completely calm throughout his conversation with Jackson. Jackson Bodycam at 1:24–3:46. When Jackson attempted to handcuff Phelps, Phelps did not react with threats or violence but rather asked for help. *Id.* at 3:55–4:26. Further, there was no indication that Phelps had a weapon.[5] "A reasonable officer would not believe that [Phelps] posed an immediate threat of harm when there was nothing—no evasive movements towards a waistband, no threats of violence, no charging towards the officer—suggesting possession or intent to possess a weapon." *Shumate*, 44 F.4th at 444. Prior to being tased, Phelps was on the ground with his hands held up and open in front of him. Jackson Bodycam at 5:25–6:58. As we have previously held, "an individual poses little threat of harm when her hands are in the air indicating submission." *Kent v. Oakland County*, 810 F.3d 384, 391 (6th Cir. 2016); *see also Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006) ("By raising his hands in the surrender position, [the plaintiff] arguably showed that he was unarmed, was compliant, and was not a significant threat to [the officer's] safety."). A reasonable jury could find that Phelps posed a total non-threat to any person; thus, this factor, like the first, strongly weighs in his favor.

## 3. Resisting Arrest

As is often true in taser cases, the reasonableness of Moore's conduct "turns on active resistance." *Kent*, 810 F.3d at 392. "When a suspect actively resists arrest, the police can use a

---

[5]Moore argues that Phelps could have used the loose handcuff dangling from his wrist as a weapon, and that while on the ground Phelps was very close to the gun holstered on Moore's ankle. As the district court concluded, neither argument holds water. R. 59 (D. Ct. Op. at 30 n.9) (Page ID #1511). The video evidence does not show Phelps attempting to use the handcuff as a weapon or reaching for Moore's firearm.

taser . . . to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot." *Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015). "Active resistance has been found where 'some outward manifestation—either verbal or physical—on the part of the suspect had suggested volitional and conscious defiance.'" *Shumate*, 44 F.4th at 446 (quoting *Eldridge v. City of Warren*, 533 F. App'x 529, 534 (6th Cir. 2013)). Importantly, "noncompliance alone does not indicate active resistance." *Id.* (citation modified). Not all resistance is active—passive resistance "entails a lack of physical resistance or verbal antagonism." *King*, 97 F.4th at 396 (citation modified). We have repeatedly held that passive resistance "does not justify" the degree of force that includes tasing. *Moore v. Oakland County*, 126 F.4th 1163, 1168 (6th Cir. 2025) (quoting *Browning v. Edmonson County*, 18 F.4th 516, 527 (6th Cir. 2021)).

Phelps has produced evidence that would support a reasonable jury's finding that when Moore tased Phelps the first time, Phelps was at most passively resisting. The video evidence is crystal clear: For about a minute and a half before Moore tased Phelps, Phelps was seated on the ground, leaning back in a defensive posture, facing the officers with his hands held up and open in front of him. *See* Jackson Bodycam at 5:25–7:00; Jackson Dashcam at 5:36–7:06; Moore Bodycam at 0:18–25. He was not "kicking, flailing, and wriggling away from [the officers'] grasp." *Roell v. Hamilton County*, 870 F.3d 471, 482 (6th Cir. 2017). Nor was he verbally aggressive, hostile, or threatening. *See Browning*, 18 F.4th at 527. Quite the opposite—Phelps was polite and pleading. *See, e.g.*, Jackson Bodycam at 5:27–33 ("Please don't."); *id.* at 5:33–34 ("Please, I'm begging you."). Indeed, Phelps attempted to deescalate the situation, asking the officers to "stop yelling," *id.* at 6:02–04, and telling Moore he "do[es]n't have to do this," *id.* at

14

5:49–52. A jury could find that no reasonable officer could have perceived Phelps's frightened cowering on the ground as active resistance.

To be sure, Phelps did not put his arms and hands behind his back as the officers repeatedly commanded. But Phelps's "failure to readily offer his arms for cuffing does not reflect a deliberate act of defiance using one's own body" as characterizes active resistance. *Shumate*, 44 F.4th at 448 (citation modified). "We have previously elaborated that a failure to present one's arms to an officer upon request without more constitutes passive resistance at most." *Jackson-Gibson*, 118 F.4th at 856–57 (citation modified); *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1006 (6th Cir. 2024) ("[W]e have found passive, not active, resistance when suspects do not readily present their hands for handcuffing, or even when suspects move their arms slightly while officers are attempting to handcuff them or otherwise gain control of them.").[6] Phelps did not put his hands behind his back; he instead kept them raised in the air in a display of surrender. We think the instinct to keep one's hands up while being held at taser-point is understandable. In any event, Phelps remained nearly motionless on the ground in the minutes before being tased. "Whatever 'active' means, it has to

---

[6] We note that we have made seemingly contradictory comments in other cases. None, however, alter our conclusion here. For example, in *Kent v. Oakland County*, in defining active resistance we noted that it "includes refusing to move your hands for the police to handcuff you." 810 F.3d 384, 392 (6th Cir. 2016) (citation modified). But as discussed below, *infra* Section III.C, we concluded that the officer's use of a taser on the plaintiff was objectively unreasonable given the plaintiff's submissive posture—despite that he had yelled at officers and refused to comply with their commands. *Id.* at 391–92. Similarly, we remarked in *Browning v. Edmonson County* that active resistance "generally means," among other things, "refusal or resistance to being handcuffed." 18 F.4th 516, 527 (6th Cir. 2021). Again, to take that statement in isolation would mischaracterize our actual analysis and holding. Although the officer professed a belief that the plaintiff could have a weapon, we nonetheless concluded that the plaintiff "had a clearly established constitutional right not to be tased where he showed no resistance other than a passive failure to respond to an order to show his hands." *Id.* at 526. We distinguished cases that had deemed the use of a taser reasonable on the basis that such cases involved the plaintiff's "being verbally hostile" or "taking some sort of voluntary physical action in addition to their noncompliance." *Id.* at 527–28. Finally, *Moore v. Oakland County* did not involve the use of a taser, so our comment there that active resistance includes "resisting handcuffs" is not relevant to our analysis here. 126 F.4th 1163, 1168 (6th Cir. 2025).

15

mean something more than mere . . . inaction. To characterize such 'resistance' as 'active' is to deprive the word of all meaning." *Browning*, 18 F.4th at 526–27.

Moore did not stop after the first tasing: He tased Phelps three more times. The second taser deployment came about three seconds after the first, followed by a third about fifteen seconds later, and a fourth fifteen seconds after that. Jackson Bodycam at 7:04–42. Unsurprisingly, Phelps did not start actively resisting in the thirty-five seconds during which he was tased four times. Phelps was tased using the prongs, subjecting him to muscular incapacitation. His jerking and flailing movements in those thirty-five seconds were, therefore, fairly attributable to the effects of the taser.[7] Furthermore, Moore did not give Phelps sufficient time to comply with commands as Phelps recovered from the tasings. Phelps specifically told the officers after the third tasing that he could not move, *id.* at 7:27–31; Moore promptly tased him again. *See Smith v. City of Troy*, 874 F.3d 938, 946 (6th Cir. 2017) (per curiam) (holding that an officer used excessive force when he tased a suspect for forty-eight seconds within two minutes, giving the suspect insufficient time to comply with orders); *Goodwin v. City of Painesville*, 781 F.3d 314, 325 (6th Cir. 2015) (similar). All told, a reasonable jury could find that Phelps was not actively resisting at any point during the tasings.

On appeal, Moore protests that focusing attention primarily on the duration of the taser deployments and the minute and a half preceding them amounts to using an impermissible moment-of-threat rule. D. 21 (Reply Br. at 6–8) (citing *Barnes v. Felix*, 605 U.S. 73 (2025)). He

---

[7]Moore asserts that Phelps intentionally dislodged the probes after the first tasing "by swiping his arm." D. 12 (Appellant Br. at 5, 15, 17). Whether or not this alleged fact would have justified a second tasing, it is belied by the record. Taking the evidence in the light most favorable to Phelps, the videos appear to show that the prongs were dislodged while Phelps rolled and flailed in response to being tased. *See* Bystander Video at 4:33–36.

is wrong. To be clear, we understand that we may consider any part of the incident from start to finish. We have not "put on chronological blinders," *Barnes*, 605 U.S. at 82; rather, the occurrences before Phelps was on the ground with a taser pointed at him are not particularly relevant. The circumstances of this case are a far cry from the myopic analysis of two seconds that the Supreme Court rejected in *Barnes*. Here, Phelps was on the ground in a submissive position with his hands up, pleading to defuse the situation, for a full minute and a half before Moore tased him. Although that might not sound like a long time in the context of one's daily life, anyone watching the videos in this case could conclude that it is a considerable amount of time for relative calm in the context of an unfolding police interaction (which lasted under ten minutes from start to finish).

More importantly, our caselaw is clear that tasing a suspect who "has ceased resisting" constitutes excessive force, "even if the suspect did offer some resistance at the outset." *Goodwin*, 781 F.3d at 328; *see also Feagin v. Mansfield Police Dep't*, 155 F.4th 595, 604 (6th Cir. 2025) (officers are liable for excessive force when they tase "a suspect who posed no danger and . . . had completely ceased resisting at the time of the tasing"); *Jackson-Gibson*, 118 F.4th at 857 ("[E]ven if [the plaintiff] had exhibited active resistance [earlier in the encounter], such active resistance had ceased by the time [the officer] proceeded to tase him." (citing *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012))). Again, here, when Moore tased Phelps, Phelps was on the ground with his hands up. "[A]pplication of a Taser to a suspect who has ceased virtually all resistance constitutes excessive force, even if the suspect had resisted violently earlier in the encounter." *Goodwin*, 781 F.3d at 327.

17

Of course, at no point had Phelps even come close to "violently" resisting.[8] When Jackson and Kzinowek first attempted to handcuff Phelps, Phelps did not allow his arms to be moved behind his back. *See* Jackson Bodycam at 3:48–4:26.[9] Jackson and Kzinowek took Phelps to the ground. Jackson Dashcam at 4:27–31. Phelps got up on his hands and knees, and Jackson kneed him four times. *Id.* at 4:25–37; Kzinowek Bodycam at 3:50–52. Phelps apparently pulled his right arm from Kzinowek's grasp.[10] Jackson Dashcam at 4:33–55. True, "a physical struggle to maintain control of one's limbs while being placed in handcuffs *can* be active resistance." *King*, 97 F.4th at 396 (citation modified). "But the fact that a suspect does not immediately surrender does not inherently mean that he is resisting." *LaPlante v. City of Battle Creek*, 30 F.4th 572, 580 (6th Cir. 2022); *see Saalim*, 97 F.4th at 1007 ("[W]hen this Court has found that moving hands away to avoid being handcuffed constitutes active resistance, there have been other indicia of resistance that are not present in this case.").

A reasonable jury could conclude that Phelps's conduct did not bear any other hallmark of active resistance. He was not verbally hostile—he asked the officers to "slow down" and told them that he was afraid. Jackson Bodycam at 3:55–4:10. He did not "threaten[]" police or "act[] erratically." *Moore*, 126 F.4th at 1168. And, crucially, no officer told Phelps he was under arrest

---

[8]It is notable that in his deposition Jackson himself described Phelps's resistance as "passive." R. 47-3 (Jackson Dep. at 70, 80) (Page ID #604, 667).

[9]The dissent insists that Phelps "fought off the officers" in a "brawl." Dissent at 30. But a reasonable jury could view the video evidence and disagree with that characterization.

[10]Moore claims that Jackson "had to press his (Jackson's) hands down to prevent [Phelps] from standing up" and suggests that this constitutes active resistance on Phelps's part. D. 21 (Reply Br. at 7). It is unclear how Phelps was supposed to put his hands behind his back in that position. He was propping himself with his hands, so with Jackson pushing him down, any attempt to move his hands behind his back would have entailed Phelps hitting the ground flat on his face.

until he was on the ground with his hands up and a taser trained on him. Jackson Bodycam at 5:56–57; *see Wright v. City of Euclid*, 962 F.3d 852, 868–69 (6th Cir. 2020). "[T]he mere failure of a citizen—not arrested for any crime—to follow the officer's commands does not give a law enforcement official authority to put the citizen in handcuffs." *Wright*, 962 F.3d at 868 (quoting *Smith*, 874 F.3d at 945); *cf. Steger v. Willis*, --- F.4th ----, 2026 WL 2097781, at *2 (6th Cir. 2026). A jury could find that any resistance Phelps offered, therefore, "was merely passive." *Shumate*, 44 F.4th at 448. Thus, the events prior to Phelps's taking a surrender position do not weaken Phelps's case against Moore.

* * *

In sum, a reasonable jury could find that every *Graham* factor weighs in Phelps's favor in this case: Phelps's suspected offense was minor, he did not pose a safety threat, and he did not actively resist. Considering the totality of the circumstances, a reasonable jury could conclude that Moore's repeated tasing of Phelps in quick succession was objectively unreasonable and amounts to a violation of Phelps's right to be free from excessive force.[11]

## C. Clearly Established

Having determined that a jury could find that Moore violated Phelps's constitutional rights, we turn now to whether that right was clearly established at the time of the conduct, in July 2020. "To find that a right is clearly established, courts generally need to identify a case where an officer acting under similar circumstances was held to have violated the Constitution." *Zorn v. Linton*,

---

[11]The dissent asks what "the officers [were] supposed to do" in these circumstances. Dissent at 31. It is not our role to speculate about the many different options the officers had. But what we can say is that whatever force may or may not have been appropriate, the officers were not permitted to tase Phelps merely because they grew tired of "exercis[ing] patience." *Id.* An officer's frustration does not make reasonable a use of force.

607 U.S. 568, 572 (2026) (citation modified). The conclusion that a right is clearly established "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). In defining the right at issue, courts must take care not to generalize too much or too little. *Hagans*, 695 F.3d at 508. "If it defeats the qualified-immunity analysis to define the right too broadly . . . , it defeats the purpose of § 1983 to define the right too narrowly . . . ." *Id.* at 508–09. Thus, "[p]rinciples stated generally, such as that an officer may not use unreasonable and excessive force, do not suffice." *Zorn*, 607 U.S. at 572 (citation modified). Still, "[a]n action's unlawfulness may be plain 'from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs.'" *Martin v. City of Broadview Heights*, 712 F.3d 951, 961 (6th Cir. 2013) (quoting *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004)).

The clearly-established question is not a difficult one in this case. By July 2020 it was absolutely beyond debate that an officer's tasing of an individual who does not pose a threat to anyone's safety and is not actively resisting arrest constitutes excessive force. *See, e.g.*, *Goodwin*, 781 F.3d at 327 ("Our determination in *Landis* [in 2008] that the officers were not entitled to qualified immunity regarding the use of a Taser provided notice that application of a Taser to a suspect who has ceased virtually all resistance constitutes excessive force, even if the suspect had resisted violently earlier in the encounter." (citation omitted)); *Shumate*, 44 F.4th at 450 ("By 2019 . . . the right to be free from physical force when one is not actively resisting the police was clearly established. It was also clearly established in this Circuit that an individual has a constitutional right not to be tased when he is not actively resisting." (citations omitted)); *Meadows v. City of Walker*, 46 F.4th 416, 422 (6th Cir. 2022) ("It has been clearly established for several

20

years in the Sixth Circuit that an officer cannot use injurious physical force to subdue a suspect that is not actively resisting arrest." (citing *Rudlaff*, 791 F.3d at 641–42)). We have repeated this principle time and time again. In *Meadows* in 2022, for example, we relied on *Hagans*, a 2012 case, for its summary of "cases from 2004 onwards where we have held force to be excessive from the use of a taser when 'the suspects were compliant or had stopped resisting.'" 46 F.4th at 422 (quoting *Hagans*, 695 F.3d at 509).

We use two cases as illustrative examples of the clearly defined right implicated here. In *Goodwin v. City of Painesville*, officers responded to reports of noise and possible fighting at David Nall's apartment. 781 F.3d at 318. As they approached Nall's door, a woman exited and told them Nall was "crazy" and had made serious threats. *Id.* at 319. When Nall answered the door, an officer asked him to step outside. Nall responded that he did not have to, turned, and walked back into the apartment. *Id.* The officers entered the apartment and Officer Soto fired taser probes into Nall's chest. *Id.* We held that Soto was not entitled to qualified immunity on Nall's excessive-force claim. *Id.* at 328. Nall's statement that he did not have to leave his apartment and his refusal to do so, we concluded, did not constitute active resistance. *Id.* at 323–24. We further noted that, even if they did, "previously-resisting suspects have a constitutional right to be free of a gratuitous application of a Taser once they have stopped all resistance." *Id.* at 324.

In *Kent v. Oakland County*, Kent was trying to prevent EMTs from attempting life-saving measures on his father, who Kent represented had a do-not-resuscitate order. 810 F.3d at 387–88. Officers arrived to assist. *Id.* Kent yelled at the EMTs and officers, "gesturing with his hands and 'flailing' his arms in the air." *Id.* at 388. He refused officers' commands to calm down, to lower

his hands, and to leave the room. *Id.* One officer, Lopez, brandished his taser and told Kent that he would tase him if Kent did not calm down. "Kent, who says he was standing with his hands raised in the air and his back to the wall at this point, undisputedly said, 'Go ahead and Taze me, then.' Lopez deployed the taser in dart mode." *Id.* As in *Goodwin,* we held that Lopez was not entitled to qualified immunity on Kent's excessive-force claim. *Id.* at 396–97. Although Kent did not "fully comply" with the officers' orders and "yelled" at them, we concluded that his behavior did not rise to the level of active resistance and that Lopez's conduct in tasing Kent was objectively unreasonable. *Id.* at 393–95.

Moore could have "read" *Goodwin* and *Kent*, among other cases, and "known that they proscribed his specific conduct." *Zorn,* 607 U.S. at 572 (citation modified). Like the suspects in *Goodwin* and *Kent*, Phelps did not fully obey the officers' commands (in this case, to put his hands behind his back). But, as we concluded in *Goodwin* and *Kent*, this failure alone does not amount to active resistance. Indeed, we did not find there to be active resistance in *Goodwin* or in *Kent* even though the individuals in those cases were verbally rude or hostile. Those cases, then, suffice to have put Moore on notice that Phelps, if he was polite and pleading, was not actively resisting. Moore tased Phelps while Phelps was on the ground with his hands up in a submissive posture. *See Baker*, 471 F.3d at 607 (holding that an officer used excessive force when he struck a suspect's head with his baton where the suspect had "rais[ed] his hands in the surrender position, . . . arguably show[ing] that he was unarmed, was compliant, and was not a significant threat to [the officer's] safety."). It was objectively unreasonable for the officers in *Goodwin* and *Kent* to tase Nall and Kent, respectively, and it is clearly established that it would have been objectively unreasonable for Moore to tase Phelps.

22

We have held that the right not to be tased when one is not actively resisting arrest was clearly established "by 2018," *Browning*, 18 F.4th at 525, "[b]y 2019," *Shumate*, 44 F.4th at 450; *Jackson-Gibson*, 118 F.4th at 858, and "in April 2020," *Saalim*, 97 F.4th at 1009–10. In line with our precedent, we hold that the right was clearly established when Moore tased Phelps in July 2020.

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of summary judgment based on qualified immunity to Moore on Phelps's excessive-force claim, and **REMAND** for further proceedings.

THAPAR, Circuit Judge, dissenting. Officers ordered Cornelius Phelps to put his hands behind his back more than 70 times. But Phelps didn't obey a single one of those orders. Instead, he fought off the officers' efforts to handcuff him. For over a minute and a half, he continued to defy the officers. And he ignored their warnings that they would tase him if he didn't comply. All the while, Phelps had a loose metal handcuff on his wrist that he could use as a weapon. So, after exercising a great deal of patience, Officer Terrance Moore tased Phelps.

Moore's actions were reasonable, and our caselaw didn't give him any clear guidance that his actions were unlawful. Still, the majority denies him qualified immunity. I respectfully dissent.

I.

Consider everything Officer Moore confronted when he tased Phelps. It was the summer of 2020, and a group called the Ghost of George Floyd was staging demonstrations over law-enforcement practices after Floyd's death. One afternoon that summer, the group planned a protest outside the Fraternal Order of Police Lodge in Saginaw. Saginaw police officers believed the group's members were trespassing on private property. So officers responded to the scene, and a tense confrontation ensued.

An officer first directed the protestors to leave the property. But Phelps, a protestor who was substantially taller than the officers, refused to comply. Instead, he said there were "things to figure out" and told the officers to "forgive those who trespass." R. 47-14 at 02:24–02:32. He argued that the group wasn't trespassing and was instead on a public right of way.

An officer then asked Phelps for his identification. When Phelps didn't provide it, the officer told him to put his hands behind his back. The officer sought to temporarily detain Phelps to identify him—a standard police practice. But Phelps didn't comply with that order, either.

24

Instead, he resisted. Officers then managed to apply one handcuff, which stayed on Phelps's wrist for the rest of the confrontation.

Even with one handcuff attached and one officer tugging at each arm, the officers still couldn't bring Phelps's hands behind his back. After pulling the officers in a circle, Phelps dropped to the ground on all fours. There, he kept wrestling his arms away from the officers. Phelps eventually spun onto his back and broke free of the officers' grasps.

Despite this continued resistance, Moore didn't tase Phelps right away. Instead, he gave Phelps more than a minute and a half to comply with the officers' orders. Throughout the encounter, the officers ordered Phelps to put his hands behind his back over 70 times. And they repeatedly warned Phelps that they would tase him if he didn't comply. Still, he didn't comply. Faced with Phelps's unrelenting defiance, Moore deployed his taser. It took another struggle and additional tasings for the officers to finally secure Phelps's arms behind his back, fully handcuff him, and take him into custody.

## II.

Moore's actions didn't violate the Constitution. But even assuming that was debatable, Moore didn't violate any clearly established rights.

Qualified immunity protects an officer unless he (1) violated a constitutional right (2) that was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Phelps bears the burden of establishing that the second prong was satisfied. *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022). That burden is heavy. After all, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quotation omitted).

25

To brand Moore as plainly incompetent, Phelps must show that *every* reasonable officer in Moore's shoes would have known his conduct was unlawful. *Id.* That means Phelps must "identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment," thus placing the constitutional question "beyond debate." *Id.* at 64 (quotation omitted). But he identifies no such case, so Moore is entitled to qualified immunity.

For starters, we all agree on one thing: Officers may lawfully tase a suspect—"even multiple times"—if he actively resists arrest. *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015). So what constitutes active resistance?

We've repeatedly held that "refusal or resistance to being handcuffed" counts as active resistance. *Browning v. Edmonson County*, 18 F.4th 516, 527 (6th Cir. 2021); *Kent v. Oakland County*, 810 F.3d 384, 392 (6th Cir. 2016); *Moore v. Oakland County*, 126 F.4th 1163, 1168 (6th Cir. 2025). Based on these cases alone, a reasonable officer could conclude that tasing Phelps was justified because he refused to be handcuffed and thus was actively resisting. In short, officers may rely on our binding precedent. And they surely aren't incompetent for doing so. That should be the end of this case.

But it's not. How does the majority avoid this conclusion? It doesn't deny that we've made "statement[s]" that active resistance includes refusing to be handcuffed. Maj. Op. at 15 n.6. Yet it says those "statement[s] in isolation mischaracterize our actual analysis and holding." *Id.* So, from "the peace of a judge's chambers," the majority meticulously distinguishes our dicta from our holdings and brushes that alleged dicta aside. *Kent*, 810 F.3d at 391 (quotation omitted).

The majority's distinctions are unpersuasive. True, these cases didn't ultimately deal with an order to submit to handcuffing. *Id.* at 388–89; *Browning*, 18 F.4th at 524; *Moore*, 126 F.4th at

1166. Also true, the officer in one case didn't use a taser. *Moore*, 126 F.4th at 1169. But each case turned on the meaning of active resistance. And each case stated that active resistance includes refusing or resisting handcuffing. So a reasonable officer could conclude that the Constitution permitted him to tase a suspect who resisted handcuffing.

That means Moore wasn't plainly incompetent just because he didn't see things the majority's way. After all, we as judges often struggle to distinguish between dicta and holdings in our previous opinions. *See Wright v. Spaulding*, 939 F.3d 695, 700–02 (6th Cir. 2019). And "officers are trained to protect the public, not pore through casebooks." *Bender v. Vill. of Mariemont*, 180 F.4th 861, 887 (6th Cir. 2026) (Thapar, J., dissenting). So how can the majority expect Moore to have parsed these tenuous distinctions while resolving a tense and rapidly evolving situation? The majority provides no answer.

Instead, the majority continues its winding tour through our caselaw, offering three recent cases for the proposition that a suspect's failure to submit to handcuffing, standing alone, may not constitute active resistance. *Shumate v. City of Adrian*, 44 F.4th 427, 448 (6th Cir. 2022); *Jackson-Gibson v. Beasley*, 118 F.4th 848, 856–57 (6th Cir. 2024); *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1006 (6th Cir. 2024). But that rule contradicts our earlier (and later) cases holding the opposite. *See Kent*, 810 F.3d at 392; *Browning*, 18 F.4th at 527; *Moore*, 126 F.4th at 1168. So how would an officer know which of our conflicting lines of precedent to follow?

What's more, the majority's three cases post-date the events here. And only existing precedent can give an officer notice that his actions are unlawful. *Wesby*, 583 U.S. at 63. That means the majority's cases are too late.

Perhaps most importantly, the majority recognizes that our caselaw is "seemingly contradictory" on whether resisting handcuffs constitutes active resistance. Maj. Op. at 15 n.6. That concession effectively resolves this case. When there's "uncertainty over the controlling legal standards," the law isn't clearly established. *Howell v. McCormick*, 148 F.4th 834, 847 (6th Cir. 2025). So here, the "fractured nature of the case law confirms" that Moore is entitled to qualified immunity. *Id.*

But even if our caselaw was consistent, Moore would still be entitled to qualified immunity. The Supreme Court has "repeatedly told" us "not to define clearly established law at too high a level of generality." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam). So a prior case must "squarely" govern the circumstances that Moore faced. *Mullenix v. Luna*, 577 U.S. 7, 15 (2015) (quotation omitted). The majority proposes two candidates. Neither fits the bill.

In one case, officers asked a man to step out of his apartment. *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015). He refused and retreated inside. *Id.* An officer immediately followed him in and tased him. *Id.* We denied the officer qualified immunity. *Id.* at 328. In the other case, officers told the plaintiff to calm down and leave a room in his house. *Kent*, 810 F.3d at 388. The plaintiff refused. *Id.* An officer warned that he would tase the plaintiff if he didn't calm down—and after the plaintiff told him to go ahead and do it, the officer tased him. *Id.* Again, we denied qualified immunity. *Id.* at 397.

Neither case clearly establishes that Moore's conduct was unlawful. For starters, neither involved a suspect who disobeyed more than 70 orders over the course of several minutes. In *Goodwin*, the plaintiff defied the officer only once. 781 F.3d at 323. In fact, he didn't have any reason to know officers were trying to take him into custody. *See id.* That makes his retreat into

28

his own apartment look a lot less like active resistance than Phelps's belligerent defiance. And in *Kent*, the plaintiff "never attempted to prevent officers from handcuffing him." 810 F.3d at 393. That passivity is a far cry from Phelps's physical resistance to being handcuffed.

Plus, neither of the suspects in the majority's cases had a weapon. *Goodwin*, 781 F.3d at 319; *Kent*, 810 F.3d at 391. In contrast, Phelps had a loose metal handcuff that the officers reasonably believed he could use as a weapon. We've noted before in a tasing case that a loose handcuff can be used as a weapon against officers. *Shreve v. Franklin County*, 743 F.3d 126, 135 (6th Cir. 2014). Phelps, of course, could have eliminated that danger by obeying the officers' commands and putting his hands behind his back. Instead, Phelps "repeatedly refused to take an action that a reasonable officer would have regarded as a way of measurably reducing the risk to the officer's safety." *Shanaberg v. Licking County*, 936 F.3d 453, 457 (6th Cir. 2019). So a reasonable officer could have concluded that tasing Phelps was a lawful measure to eliminate the threat he posed.

In response, the majority shrugs off the officers' concerns. It points out that video evidence didn't show Phelps "attempting" to swing the handcuff. Maj. Op. at 13 n.5. But that's not how we determine whether a suspect poses a threat. If a suspect is holding a knife, must he "attempt" to use it before officers may consider him a threat? Surely not. Even actions suggesting that a suspect is trying to *access* a weapon can render that suspect a threat to officers. *See Feagin v. Mansfield Police Dep't*, 155 F.4th 595, 606 (6th Cir. 2025). Here, Phelps had a dangerous object attached to his wrist, and he had already physically resisted the officers. *See Shreve*, 743 F.3d at 130, 135. So Moore didn't need to wait until Phelps attempted to strike him with the handcuff to tase him.

What's more, neither *Goodwin* nor *Kent* involved a suspect who physically fought off attempts to handcuff him. Here, Phelps pulled his hands from the officers, tugged the officers around as they held on, dropped to the ground on all fours, continued wresting his hands away, and then twisted free from the officers' grip. This difference matters. "Physical struggles with the police qualify" as "active resistance." *Feagin*, 155 F.4th at 604. And neither *Kent* nor *Goodwin* involved such active resistance. So they couldn't clearly establish any guidance for the situation Moore faced: a suspect who physically fought officers and actively resisted arrest.

How does the majority get around the physical struggle? By ignoring it. When analyzing whether Phelps was actively resisting, the majority's story begins "about a minute and a half before Moore tased Phelps." Maj. Op. at 14. That starting point is no coincidence—it chops off Phelps's brawl with the officers. To the majority, that struggle was "not particularly relevant" because Phelps ceased his active resistance in the 90 seconds between freeing himself from the officers and being tased. *Id.* at 18. But the majority's response turns a blind eye to the reality on the ground. During the 90 seconds after Phelps fought off the officers, he disobeyed dozens of commands to surrender. And "active resistance" can include "verbal hostility or a deliberate act of defiance." *Feagin*, 155 F.4th at 604. It's hard to think of any other way to characterize Phelps's disobedience.

The majority's focus on the moments immediately before the tasing also contravenes Supreme Court precedent. Excessive-force cases require courts to analyze the totality of the circumstances. *Barnes v. Felix*, 605 U.S. 73, 80 (2025). That means a use of force can be justified by "what had transpired in the preceding period," which can include the "prior five minutes." *Id.* at 81 (quotation omitted). Yet the majority "put[s] on chronological blinders," limiting itself to a

90-second window that cuts out one of the key factual differences separating this case from the prior decisions on which the majority relies. *Id.* at 82.

Ignoring Phelps's physical struggle with officers also leads to perverse results. To see why, consider a hypothetical. Imagine the officers tased Phelps as he was fighting them and before he could break free. No one could seriously dispute that Phelps was actively resisting then. Instead, the officers exercised patience and tried to get him to comply without the tasing. Their reward? He repeatedly—70 times in fact—disobeyed their lawful commands. In doing so, Phelps attracted a crowd—making the situation more dangerous for all involved. At this point, what were the officers supposed to do? Walk away and incentivize resistance? The majority doesn't tell us. Instead, the majority punishes Moore for giving Phelps 90 extra seconds to comply rather than tasing him as soon as he began pulling away. If Moore's restraint was his downfall and Phelps's fight was his windfall, something has gone seriously awry with our qualified-immunity jurisprudence.

\* \* \*

Would every reasonable officer have known that it violates the Constitution to tase a suspect who fought off officers, disobeyed them more than 70 times, and had a potential weapon on his wrist? To ask the question is to answer it.

I respectfully dissent.